UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERARD EICHBAUER,

Plaintiff,

v.

HENRY FORD HEALTH SYSTEM &
HENRY FORD HOSPITAL,

Defendants.

_____/

Case No. 16-cv-11404

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
R. STEVEN WHALEN

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [32]

### I. INTRODUCTION

On April 19, 2016, Gerald Eichbauer ("Plaintiff") filed a Complaint against Henry Ford Health System and Henry Ford Hospital ("Defendants"). *See* Dkt. No. 1. On May 5, 2016, Plaintiff submitted an Amended Complaint, alleging five violations of state and federal law: violations of the federal Family and Medical Leave Act (FMLA) (Counts I and II); violations of Michigan's Elliott-Larsen Civil Rights Act (Counts III and IV); and violations of Michigan's Persons with Disabilities Civil Rights Act (PWDCRA) (Count V). Dkt. No. 4, pp. 9–13 (Pg. ID 25–29).

Presently before the Court is Defendants' Motion for Summary Judgment [32]. Upon review of the pleadings, the Court determines that a hearing will not aid

in the resolution of this motion. E.D. Mich. LR 7.1(f)(2). For the reasons discussed herein, the Court will **GRANT IN PART and DENY IN PART** Defendants' Motion for Summary Judgment [32].

## II. BACKGROUND

### A. Plaintiff's Employment at Henry Ford Health System

Plaintiff Gerald Eichbauer first began working as a Certified Registered Nurse Anesthetist (CRNA) for Defendants, Henry Ford Health System and Henry Ford Hospital, in September 1988. Dkt. No. 32-2, p. 3 (Pg. ID 289). In March 2003, Plaintiff left Defendants to work for a different hospital, returning to Defendants' employment in October 2007. *Id.* at 4. Thereafter, Plaintiff worked at Defendants' ambulatory surgery sites, including Fairlane Hospital, Cottage Hospital in Grosse Pointe Farms, and Lakeside Hospital in Sterling Heights. *Id.* at 4–5.

Plaintiff's lead CRNA was Susan Trout, who reported to Cindy Bendure. Dkt. No. 46-2, p. 3 (Pg. ID 688). Plaintiff got along with Bendure, who he described as "a pretty easygoing chick." Dkt. No. 32-3, p. 4 (Pg. ID 290). Bendure reported to Claude Johnson, the CRNA manager, who oversees CRNAs through Defendants' health system. Dkt. No. 46-2, p. 3 (Pg. ID 688); Dkt. No. 46-5, p. 2 (Pg. ID 736). In Plaintiff's last performance review from 2010, he was listed as "Superior" or "Commendable" in all areas. Dkt. No. 46-3. Prior to taking FMLA

leave, Plaintiff had not had any documented performance issues. Dkt. No. 46-4, p. 3 (Pg. ID 716). Physicians with whom Plaintiff worked described him as "very confident, expedient, technically, as well as clinically." Dkt. No. 46-6, p. 7 (Pg. ID 758).

## B. Plaintiff's FMLA Leave

In the summer of 2014, Plaintiff suffered from a knee problem that required surgery. Dkt. No. 32-2, p. 8 (Pg. ID 294).[1] Plaintiff notified Bendure of his intention to take leave, and Bendure called Nancy Farquharson in Human Resources for instructions on how to proceed. Dkt. No. 46-4, pp. 3–4 (Pg. ID 716–17).

Defendants use Cigna, a third-party claims processor, to handle FMLA leave. Dkt. No. 46-4, p. 20 (Pg. ID 733). Plaintiff made a request to Cigna on July 28, 2014 for a continuous leave of absence from July 25, 2014 to September 4, 2014. Dkt. No. 46-10, p. 1 (Pg. ID 794). By August 19, 2014, Cigna had approved Plaintiff's request for FMLA leave until September 4, 2014. *Id.* at 4. By September 3, 2014, Cigna recorded that Plaintiff sought to extend his leave until October 20, 2014, although his FMLA leave was exhausted as of October 16, 2014. *Id.* at 6. By

---

[1] Plaintiff alleges that Dr. Aarti Banker told him, "Gary, this isn't a good time to leave," Dkt. No. 46, p. 8 (Pg. ID 661); however, Plaintiff did not attach the deposition transcript regarding this statement and did not seek to amend to include it. Thus, the Court does not have evidence to support the allegations regarding this statement.

September 22, 2014, Cigna had approved Plaintiff's leave until October 19, 2014, with the days after his FMLA leave was exhausted covered by a medical leave of absence. *Id*. at 12.

Around September 19, 2014, Bendure called Plaintiff to see how he was feeling and to verify approximately when he would be coming back to work. Dkt. No. 46-4, p. 4 (Pg. ID 717). She required him to submit a doctor's note to confirm his leave dates, although Cigna was responsible for handling the documentation of Plaintiff's FMLA leave. *See id*. Plaintiff felt that Bendure was "a little demanding and sassy," but he got her the letter and continued the remainder of his twelve weeks of FMLA leave without further interruption. Dkt. No. 46-2, p. 8 (Pg. ID 693).

During the time Plaintiff was on leave, Defendants were short-staffed and used contingent staffers and an agency to replace Plaintiff. Dkt. No. 46-4, p. 5 (Pg. ID 718). Plaintiff continued to receive his salary during his leave. *Id*. Plaintiff testified that he was never told that he could not take the full amount of FMLA leave. Dkt. No. 32-2, p. 10 (Pg. ID 296). At the end of his leave, Defendants restored Plaintiff to his normal position and schedule. *Id*.

## C. Plaintiff's Return to Work and Reports of Abnormal Behavior

Plaintiff returned to work at Cottage Hospital on October 20, 2014. Dkt. No. 46-10, p. 12 (Pg. ID 805). Plaintiff returned from leave and resumed his normal

schedule. Dkt. No. 46-2, p. 9 (Pg. ID 694). He testifies that he was fine and off pain medication until a sciatica flare-up in November 2014. *Id.*

At the end of November or beginning of December, Bendure received the first report from a coworker, Kim Copeland, about a change in Plaintiff's demeanor. Dkt. No. 32-5, p. 7 (Pg. ID 341). Shortly thereafter in early December, two more coworkers, Susan Trout and Stephanie White Evans, separately reported concerns with Plaintiff's demeanor to Bendure. *Id.* at 8. Trout and White-Evans both spoke to Bendure on either the same day or very close in time, which raised a red flag for Bendure. *Id.* at 15.

Copeland reported that on November 26, 2014, Plaintiff reported to work with red eyes, a flat affect, and a tired appearance. Dkt. No. 32-14. Plaintiff told Copeland that he "didn't feel well," but was okay to work. *Id.* He allegedly asked Copeland, "is this all I get?" when she gave him his narcotics box for the day, and mentioned wanting to go home early around noon. *Id.* Copeland observed Plaintiff's hands were extremely shaky while he drew up medication. *Id.* She accompanied Plaintiff to the bedside of his last patient and heard him make comments about how the patient would feel on the narcotics, which she felt were inappropriate. *Id.* (reporting Plaintiff said to the patient, "You are going to feel like you are in another world. You will feel like you are back in high school. Have you ever done psychedelics?")

Trout reported to Bendure that Plaintiff's behavior had changed since he returned from leave. Dkt. No. 32-15. Whereas Trout felt Plaintiff used to be a cooperative team player, she now believed that he was more edgy and angry at work. *Id.* When Trout tried to give Plaintiff constructive criticism, particularly about how he handled narcotics, Plaintiff would now get upset. *Id.* Plaintiff also was refusing to work his portion of the late shift, citing family emergencies, unless Trout was adamant it was his turn. *Id.* Plaintiff was leaving his shift early and failing to balance his narcotics count properly. *Id.* Additionally, Trout reported that Plaintiff was mixing narcotics in a way that went against protocol and reprogramming infusion pumps to run his incorrect mixture. *Id.* Finally, Trout also reported seeing Plaintiff's hands shaking at work, while he was angry about a missing key. *Id.*

White-Evans reported an encounter with Plaintiff on November 24, 2014, where Plaintiff had kept narcotics on his cart for multiple cases. Dkt. No. 32-16; Dkt. No. 32-8, p. 4 (Pg. ID 366). Plaintiff allegedly still had Remifentanil on his cart that he stored in a drawer, even though the last patient had not received that medication and policy dictated against carrying medication from the previous patient to the next case. *Id.* When White-Evans asked Plaintiff twice if he needed assistance to follow the proper narcotics wasting procedure, Plaintiff declined and

asked her to take his waste down to the pharmacy for him. *Id.* White-Evans declined and told Plaintiff that they were not allowed to do that. *Id.*

### D. Plaintiff's Drug Test

Bendure spoke with the medical director of ambulatory surgery, Debra Wetzel, about the complaints about Plaintiff's behavior since returning from leave, and then contacted her supervisor, Johnson. Dkt. No. 32-5, p. 9 (Pg. ID 343). Johnson came out to the Cottage site the next day, December 9, 2014, and he and Bendure met with Plaintiff and asked how he was feeling since his surgery. *Id.* During that conversation, Bendure noted that Plaintiff was "scattered," "flushed," "anxious," and "kind of antsy." *Id.* at 9–10.

Johnson concluded from the meeting that something was wrong with Plaintiff and that they needed to share that with Farquharson in Human Resources. Dkt. No. 32-4, p. 8 (Pg. ID 324). Farquharson suggested that they bring Plaintiff in for drug testing based on reasonable suspicion that Plaintiff was under the influence. Dkt. No. 32-9, p. 5 (Pg. ID 373). Farquharson also instructed Bendure to compile written witness statements about Plaintiff's behavior. *Id.* at 9.

On December 10, 2014, Johnson accompanied Plaintiff to Employee Health for a urine-based drug test. Dkt. No. 32-2, pp. 10–11 (Pg. ID 296–97). Plaintiff was suspended for three days pending the test's results. *Id.* at 19. While awaiting the results of Plaintiff's drug test, Bendure assembled written statements from those

who worked with Plaintiff. Dkt. Nos. 32-14–32-18. Copeland, Trout, and White-Evans emailed Bendure written drafts of their oral reports. *See* Dkt. Nos. 32-14–32-16.

Rita Haynes, the lead pharmacist at Cottage, emailed Bendure regarding her interactions with Plaintiff. Dkt. No. 32-7, p. 5 (Pg. ID 360); Dkt. No. 32-17. According to Haynes, Plaintiff was "sloppy, lackadais[ical], and then progressively got worse" regarding his completion of required narcotics documentation. Dkt. No. 32-7, p. 4 (Pg. ID 359). Haynes testified that Plaintiff and another male CRNA were the sloppiest about narcotics documentation, but by the end, Plaintiff was "by far" the sloppiest. *Id.* Around the time Bendure requested a statement, Haynes states that Plaintiff was acting differently than he had previously. *Id.* at 5 ("He was kind of uncooperative and just acting irate, and was, like, put out by the fact that we were trying to get him to correct his sheets or finish his sheets."). Haynes emailed Bendure that Plaintiff often incorrectly recorded the amount of narcotics administered and wasted. Dkt. No. 32-17. She also reported that his writing was difficult to read, his numbers wouldn't be added properly, he would randomly change the unit of measurement from start to finish, and that he did not comply with the current narcotics wasting policy. *Id.*

Dr. Aarti Banker, the physician in charge, wrote an overall positive assessment of Plaintiff. Dkt. No. 32-18. She wrote Bendure that Plaintiff was "very

experienced, confidence, and quite proficient" in her email. *Id.* Banker noted that Plaintiff had been requesting to leave work early lately due to family issues, but she did not observe anything different since he returned from leave. *Id.* The previous week, Banker had to ask Plaintiff not to use a very high concentration of Remifentanil drip, but states he had not repeated the mistake. *Id.* Also in the prior week, Banker notes that Plaintiff became irritated with a surgeon; however, Plaintiff later apologized and agreed not to let it happen again. *Id.*

### E. Audit of Plaintiff's Narcotics Waste Documentation

Michigan law requires that information regarding controlled substances that are dispensed or administered be accurately recorded. *See* MICH. ADMIN. CODE r. 338.3601 *et seq.* At Cottage, a "Control Drug Administration Record" (CDAR) is a medication reconciliation form provided by the pharmacy that CRNAs must fill out on a daily basis. Dkt. No. 32-4, p. 15 (Pg. ID 331); Dkt. No. 32-6. CRNAs must document narcotics administered to patients, then "waste" and record any narcotics not administered on the CDAR. Dkt. No. 32-4, pp. 15–16 (Pg. ID 331–32). At Cottage, wasting of narcotics had been accomplished by taking unused narcotics to the Pharmacy for the Pharmacy to waste. Dkt. No. 32-7, pp. 6–7 (Pg. ID 361–62). In October or November 2014, the policy regarding narcotics wasting changed to "witness wasting," which required CRNAs to waste unused narcotics

down a sink as soon as the case concluded, with a witness present to sign the CDAR. Dkt. No. 46-17, p. 12 (Pg. ID 902).

Bendure performed an audit of Plaintiff's narcotics documentation while awaiting the drug test results. Dkt. No 32-5, p. 11 (Pg. ID 345). The audit determined that Plaintiff had at least thirty discrepancies in his narcotics documentation in less than two months since he returned from leave. *See* Dkt. Nos. 32-21–32-23. After the policy changed to require witness wasting as soon as possible, Plaintiff was the only CRNA who would still bring his unused narcotics to the pharmacy for wasting without a signature. Dkt. No. 32-7, pp. 6–7 (Pg. ID 361–62).

Plaintiff describes his narcotics documentation as "lazy." Dkt. No. 32-2, p. 16 (Pg. ID 302). He would instead squirt his unused narcotics into an anesthetic box with syringes and other waste. Id. at 7. Because of the discrepancies in Plaintiff's CDARs and amount of missing waste documentation, Bendure stated that Plaintiff could have diverted drugs. Dkt. No. 32-5, p. 14 (Pg. ID 348).

**F. Plaintiff's Termination**

Prior to receiving Plaintiff's drug test results, Farquharson recalls that Plaintiff called her to first report taking Tylenol 3 prior to the test, then to report he had taken Vicodin prior to the test. Dkt. No. 32-9, p. 14 (Pg. ID 382). Plaintiff does

not recall making these admissions to Farquharson. Dkt. No. 32-2, p. 13 (Pg. ID 299).

Around December 16, 2014, Plaintiff's drug test results came back positive for opiates (Vicodin) and benzodiazepine. (Valium). Dkt. No. 32-24. Plaintiff does not dispute the correctness of the drug test results. Dkt. No. 32-2, p. 14 (Pg. ID 300). He had a prior prescription for the Vicodin at the time of the test, but had not been prescribed Valium. *Id.* He received a prescription for Valium several days later. *Id.*

Johnson, Bendure, and Farquharson met regarding the results. Dkt. No. 32-4, p. 11 (Pg. ID 327); Dkt. No. 46-4, p. 14 (Pg. ID 727); Dkt. No. 46-11, pp. 5–6 (Pg. ID 817–18). Human resources recommended that Plaintiff be terminated. Dkt. No. 32-4, p. 11 (Pg. ID 327). Farquharson testified that it was a terminable offense for an individual in a patient care role to provide care to patients while under the influence. Dkt. No. 32-9, p. 10 (Pg. ID 378).

Farquharson called Plaintiff and terminated him on December 17, 2014. Dkt. No. 46-17, p. 12 (Pg. ID 902). Defendants noted on the corrective action form that Plaintiff was terminated for a positive drug test and discrepancies in his narcotics charting. Dkt. No. 32-25. *See also* Dkt. No. 32-4, p. 13 (Pg. ID 329) ("Gary was terminated because there was [sic] pharmacy discrepancies in his reconciliation of his medication, coupled with the positive drug test results.").

As required by state law, Farquharson reported Plaintiff's termination to the State of Michigan Department of Licensing and Regulatory Affairs (LARA) on January 7, 2015. Dkt. No. 46-21; MICH. COMP. LAWS § 333.20175(5). The report stated that Plaintiff's was "[t]erminated for drug diversion and urine drug screen." Dkt. No. 46-21. Plaintiff's nursing license was suspended on February 12, 2015. Dkt. No. 32-27. On September 16, 2015, Administrative Law Judge Renee Ozburn noted Plaintiff's admission to taking a friend's Valium without a prescription, but concluded "a preponderance of the evidence did not establish that [Plaintiff's] charting was negligent," and thus was not in violation of a general duty or competence. Dkt. No. 46-22, pp. 5–8 (Pg. ID 1015–18).

In March 2016, the Disciplinary Subcommittee of the Michigan Board of Nursing rejected the Administrative Law Judge's legal conclusions and found that Plaintiff's conduct had violated the Public Health Code by repeatedly failing to document wasting of controlled substances accurately. Dkt. No. 32-38. In an April 2016 final order, the Michigan Board of Nursing Disciplinary Subcommittee placed Plaintiff on probation and required him to enroll in continuing education, comply with the public health code, pay costs of compliance with the order, and fined him $250. Dkt. No. 32-29.

Plaintiff has been disabled and unable to work since December 15, 2014, two days prior to his termination. Dkt. No. 32-35.

### G. Similarly Situated Comparators

After his termination, Plaintiff was replaced by a 46-year-old female CRNA and a 50-year-old female CRNA. Dkt. No. 46-24, p. 11 (Pg. ID 1034). Defendants' CRNAs range in age from 27 years old to 74 years old, with an average age of slightly over 45 years old and a median age of 43 years old. *See* Dkt. No. 46-25. Slightly less than a fourth of Defendants' CRNAs are male. *Id*. Plaintiff was 57 years old when Defendants terminated his employment. Dkt. No. 46, p. 6 (Pg. ID 659). Eighteen percent of Defendants' listed CRNAs are older than Plaintiff. *See* Dkt. No. 46-25.

According to the evidence presented, Defendants have not terminated other CRNAs suspected of similar problems because each of these CRNAs chose to resign in lieu of termination. Dkt. No. 32-4, p. 13 (Pg. ID 329). Around May 2014, a female CRNA at Fairlane was missing narcotics and her narcotics count was off. Dkt. No. 32-30. Similar to Plaintiff, Defendants' staff met with the CRNA, but she chose to immediately resign rather than undergo further investigation or drug test. *Id*. Defendants reported the change in her staff privileges to LARA after she resigned. Dkt. No. 32-31. In July 2016, another female CRNA at Cottage voluntarily resigned in lieu of submitting to a drug test when she was confronted

regarding the possible diversion of narcotics. Dkt. No. 32-4, p. 13 (Pg. ID 329). Defendants similarly reported her resignation to LARA. Dkt. No. 32-32.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### IV. DISCUSSION

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims. *See* Dkt. No. 32, p. 2 (Pg. ID 250). Defendants claim that Plaintiff cannot establish a *prima facie* case of FMLA interference or retaliation; Plaintiff cannot establish a *prima facie* case of age, sex or disability discrimination

or retaliation; and Plaintiff cannot produce any evidence that Defendants' reasons for any alleged adverse employment action were a pretext for violations of civil rights statutes. *Id*. The Court finds that Defendants are entitled to summary judgment on Counts I and II, and will decline to exercise supplemental jurisdiction on Plaintiff's remaining state law claims. A detailed analysis is below.

### 1. Plaintiff's FMLA Claims

The FMLA provides an eligible employee up to twelve weeks of leave within a twelve-month period if the employee suffers from "a serious health condition" that makes him or her unable to perform the functions of his or her position. 29 U.S.C. § 2612(a)(1)(D); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 420 (6th Cir. 2004). To utilize FMLA leave, the eligible employee must request leave and give the employer notice that he or she is requesting such leave for a serious health condition that renders him or her unable to perform his or her position's duties. *Brenneman*, 366 F.3d at 421.

The Sixth Circuit recognizes two distinct theories for FMLA recovery: (1) the "entitlement" or "interference" theory, under 29 U.S.C. § 2615(a)(1); and (2) the "retaliation" or "discrimination" theory, under 29 U.S.C. § 2615(a)(2). *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Since Plaintiff asserts both interference and retaliation claims under the FMLA, the Court will address each in turn.

### a. Plaintiff's FMLA Interference Claim

In Count I, Plaintiff asserts that Defendants' actions interfered with Plaintiff's right to FMLA leave, as prohibited by the statute. Dkt. No. 4, p. 9 (Pg. ID No. 25).

The FMLA prohibits acts by an employer that "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(a)(1). Unlawful interference includes "refusing to authorize FMLA leave" or "discouraging an employee from using [FMLA] leave." 29 C.F.R. § 825.220(b). To establish a *prima facie* case of FMLA interference, an employee must show that:

(1) the employee was an eligible employee;
(2) the defendant was an employer as defined under the FMLA;
(3) the employee was entitled to leave under the FMLA;
(4) the employee gave the employer notice of his intention to take leave; and
(5) the employer denied the employee FMLA benefits to which he was entitled.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

"[T]he intent of the employer is irrelevant to whether an FMLA violation has occurred under the interference theory" because "an employer interferes with an employee's exercise of FMLA rights whenever the employee does not receive the rights" provided by the FMLA. *Wallner v. Hilliard*, 590 F. App'x 546, 550 (6th

Cir. 2014) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)). "Because the FMLA is not a strict-liability statute, the employee also must show that the employer's violation caused him harm." *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 496 (6th Cir. 2016) (citing *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507–08 (6th Cir. 2006)).

In the present case there is no dispute that (1) Plaintiff was an eligible employee; (2) Defendants were an employer as defined under the FMLA; (3) Plaintiff was entitled to leave under the FMLA; and (4) Plaintiff gave Defendants notice of his intention to take leave. Additionally, review of the facts illustrates that there is no dispute that Defendants granted Plaintiff the full twelve weeks of FMLA leave, Dkt. No. 46-10, p. 10 (Pg. ID 803) (noting approved FMLA leave from July 25, 2014 to October 16, 2014), plus additional days of leave after he exhausted his FMLA leave, *id.* (noting Plaintiff exhausted his FMLA leave from October 17, 2014 to October 20, 2014, but was approved for medical leave of absence). Plaintiff received full pay while out on FMLA leave and was reinstated to his former position upon returning in late October 2014. Accordingly, there is no dispute of material fact that Defendants provided Plaintiff with the FMLA benefits to which he was entitled.

Under Sixth Circuit precedent, an employee who receives all of the FMLA leave to which he is entitled and is reinstated upon return has not demonstrated FMLA interference, absent other interference with his FMLA rights. *Seeger*, 681 F.3d at 283; *see also Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 385 (6th Cir. 2017) (finding summary judgment on interference claim proper where the plaintiff did not produce evidence that the defendant denied her FMLA or failed to reinstate her after leave).

Here, Plaintiff asserts that he was discouraged from exercising FMLA leave because his supervisor called him once while on leave to ask how he was doing and when he would return, and then required him to provide a doctor's note as to that date. Dkt. No. 46, pp. 21–22 (Pg. ID 674–75). Taking Plaintiff's allegations as true, this does not establish a harm or prejudice that interfered with Plaintiff's exercise of rights granted by the FMLA.[2] The facts Plaintiff provided show that he

---

[2] While the Sixth Circuit has stated, "[p]erhaps, under certain circumstances, multiple phone calls from an employer and demands to complete more than simple tasks could rise to the level such that an employee's FMLA leave becomes unjustifiably disrupted and thereby discouraged," that is not the case here. *Tilley v. Kalamazoo Cty. Rd. Comm'n*, 654 F. App'x 675, 680 (6th Cir. 2016). In the present case, there was a single call from Plaintiff's supervisor requesting to know the date of Plaintiff's return from FMLA leave and requiring submission of medical documentation. Dkt. No. 32-2, p. 10 (Pg. ID 296) ("A: No. They just said, 'What is the date you're coming back?' "). Plaintiff agrees that he was never told that he could not take the full extent of his FMLA leave. *Id.* ("Q: Nobody ever said, "We think you should have been able to come back at 3 weeks and not take the full 6 weeks'? A: No.").

took more than the full leave granted by the FMLA and was reinstated to his same position and pay upon return. Simply put, Plaintiff has not shown harm from the physician's comment and his supervisor's singular phone call. *See Edgar*, 443 F.3d 501, 508 (6th Cir. 2006) ("Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm.").

The Court grants Defendants summary judgment on Plaintiff's FMLA interference claim.

### b. Plaintiff's FMLA Retaliation Claim

Plaintiff asserts in Count II that Defendants' termination of Plaintiff and report of Plaintiff to LARA was retaliation for taking FMLA leave. Dkt. No. 4, p. 10 (Pg. ID No. 26).

The FMLA prohibits employers from discharging or discriminating against any individual for opposing practices made unlawful by the FMLA. 29 U.S.C.

---

Additionally, although Defendants' FMLA policy is administered by third-party (Cigna), the Leave Policy Plaintiff attached as an exhibit states that "[a]n employee returning from a FMLA leave of absence . . . will be required to produce documentation of release to return to work from their medical provider" and that the employee "should contact the manager of the department to inform of return to work date to allow for time to place employee back into schedule." Dkt. No. 46-8, p. 4 (Pg. ID 778). Thus, although it appears the customary policy was to handle all documents through Cigna, the Court cannot say it was improper for Bendure to call and ask how Plaintiff was feeling, inquire as to his return date, and request documentation from his medical provider. *See Tilley*, 654 F. App'x at 680 (writing that "de minimis" phone contact that "did little, if anything, to disrupt [the employee's] FMLA leave and did not discourage [him] from taking FMLA leave" was not interference).

§ 2615(a)(2). The Sixth Circuit applies the *McDonnell Douglas* burden-shifting framework to retaliation claims that turn on circumstantial evidence. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a *prima facie* case of FMLA retaliation, an employee must show:

> (1) the employee was engaged in an activity protected by the FMLA;
> (2) the employer knew that the employee was exercising his or her rights under the FMLA;
> (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him or her; and
> (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald*, 667 F.3d at 761. "A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). A successfully pleaded prima facie case of retaliation results in the burden being shifted onto the employer to present a legitimate, non-discriminatory reason for its decision. *Donald*, 667 F.3d at 761. If the employer adequately carries this burden, then the employee must show that the employer's stated reasons are mere pretext for unlawful discrimination in order to survive summary judgment. *Id*. at 761–62.

Here, it is not disputed that (1) Plaintiff engaged in an activity protected by the FMLA; (2) that Defendants knew Plaintiff was exercising his FMLA rights;

and (3) that Defendants took an employment action adverse to Plaintiff by terminating him. Thus, the only factor in dispute is whether there was a causal connection between Plaintiff's protected FMLA activity and the adverse employment action.

### i. Whether There Was A Causal Connection Between Plaintiff's FMLA Activity And The Adverse Employment Action

This final factor requires Plaintiff to provide sufficient evidence that a reasonable jury could find a causal connection between Plaintiff's FMLA activity and the adverse action taken by Defendants. *Donald*, 667 F.3d at 761.

In the Sixth Circuit, there is not a uniform standard on whether causal connection may be established solely on the basis of temporal proximity. *Krumheuer v. GAB Robins N. Am., Inc.*, 484 F. App'x 1, 5–6 (6th Cir. 2012). *See also Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 451 n.5 (6th Cir. 2017) (addressing, without resolving, the conflict of whether "temporal proximity evidence is sufficient to both establish a *prima facie* showing of FMLA retaliation, and rebut an employer's proffered non-discriminatory reasons for the adverse employment action, or it is insufficient to do either."). In retaliation cases, the general rule is that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Id.* at 5. (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)).

When considering temporal proximity, either to show causal connection or pretext, the Court's consideration is the " 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires."[3] *Bush*, 683 F. App'x at 452. "Specifically, the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with 'other evidence of retaliatory conduct to establish causality.' " *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008)).

Here, Plaintiff began his FMLA leave on July 25, 2014 and Defendants terminated him on December 17, 2014. Dkt. Nos. 32-11, 32-25. Thus, four months and 22 days elapsed between when Defendants learned of Plaintiff's protected activity and his termination. Reviewing circuit precedent, this amount of time

---

[3] As happens periodically in the Sixth Circuit, there is conflicting precedent on this issue. *Compare Bush*, 683 F. App'x at 452 ("However, contrary to Bush's implicit assumption, the relevant timeframe for us to consider in determining whether there was a causal connection between the plaintiff's FMLA leave and the adverse employment action is the 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires.") *with Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 410 (6th Cir. 2014) ("However, we have measured temporal proximity from the date FMLA leave expired, not just when the employee first requested it, for the purposes of measuring temporal proximity."). Since neither case is published, overruled, or explicitly distinguished from the other, the Court will err on the side of caution by adopting the standard stated in the more recent decision (*Bush*), which cited to published precedent.

between the protected activity and adverse action is insufficient, on its own, to support an interference of retaliatory motive based on temporal proximity. *See Flora Parkhurst v. American Healthways Services*, LLC, No. 16-6502, 2017 WL 2790684, at *5 (6th Cir. June 27, 2017) (finding a four-month lapse between start of FMLA leave and termination, when considered with underperformance, did not support a claim of retaliation); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) (noting that plaintiffs are not precluded from "using a temporal proximity closer than four months to establish an inference of retaliation").

Plaintiff's termination occurred after he tested positive on a drug test for a controlled substance for which he did not have a prescription and after an audit found he had thirty discrepancies in his narcotics charting duties in less than two months. *See* Dkt. No. 46-16, p. 24 (Pg. ID 871); Dkt. No. 46-18. The end of his FMLA leave was used as a starting point for the audit because multiple coworkers reported that Plaintiff began to behave abnormally after returning to work in late October, compared to before his leave. *See* Dkt. No. 32-5, pp. 7–8 (Pg. ID 341–42); Dkt. No. 32-14 (reporting that Plaintiff reported to work on November 26th with red eyes, a flat affect, and tired appearance; exhibited shaky hands; and made unprofessional comments to a patient while administering anesthesia); Dkt. No. 32-15 (reporting that Plaintiff's behavior changed from being a cooperative team-player to being edgy and angry at work after he returned on October 20th); Dkt.

No. 32-16 (reporting that Plaintiff failed to properly document and waste his narcotics on November 24th). Considering the totality of the evidence, there is not enough circumstantial evidence for a reasonable jury to infer Defendants terminated Plaintiff in retaliation for exercising his FMLA rights.

### ii. Whether Defendants Articulated A Legitimate, Non-Discriminatory Reason For Terminating Plaintiff

If a plaintiff states a prima facie case of FMLA retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Bryson*, 498 F.3d at 570. To meet its burden, Defendants "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action." *Id.* at 571 (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The FMLA does not shield an employee from adverse employment action simply because the alleged misconduct concerns use of FMLA leave. *See, e.g.*, *Hoffman v. Professional Med Team*, 394 F.3d 414 (6th Cir. 2005) (no FMLA violation where employee was discharged for unprofessional conduct consisting of hostile and profane objections to employer's denial of FMLA leave).

Here, even if Plaintiff had established a prima facie case of FMLA retaliation, Defendants would have successfully articulated a legitimate, non-discriminatory reason for his termination. There is admissible evidence that

Plaintiff tested positive for a controlled substance for which he did not possess a prescription and that he failed to properly document narcotics wasting on dozens of occasions with a two-month period. This conduct would appear to violate Defendants' Drug-Free Workplace Policy and CDAR Procedures. *See* Dkt. Nos. 32-6, 32-26.

Courts have recognized that a failed drug test is a legitimate, nondiscriminatory reason for an adverse employment decision.[4] *See, e.g., Bailey v. Real Time Staffing Servs., Inc.*, 543 F. App'x 520, 524 (6th Cir. 2013) (concluding that positive result on drug test was a legitimate reason for termination); *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 929–30 (7th Cir. 2017) (finding where the plaintiff did not offer evidence that the defendant treated similarly situated applicants of other races who failed a drug test differently, a jury could not reasonably infer that the defendant was motivated by plaintiff's race rather than his test result); *Currie v. Beatrice Keller Clinic*, 493 F. App'x 855, 856 (9th Cir. 2012)

---

[4] Under Michigan law, "[a] person shall not use a controlled substance or controlled substance analogue unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this article." MICH. COMP. LAWS § 333.7404(1). Accordingly, use of Valium without a prescription would qualify as a misdemeanor offense. *See* MICH. COMP. LAWS § 333.7404(2)(b) (specifying that controlled substances under schedule IV are subject to imprisonment for not more than 1 year or a fine of not more than $1,000.00, or both); MICH. COMP. LAWS § 333.7218(a) (listing "Diazepam," commonly known under its brand name, "Valium," as a schedule IV controlled substance).

(citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (recognizing positive drug test as legitimate, nondiscriminatory reason for employer's decision)); *Evans v. Wayne Cty.*, No. 2:10-CV-11275, 2011 WL 5546230, at *9 (E.D. Mich. Nov. 10, 2011) (finding that a positive drug test was a legitimate, nondiscriminatory reason for terminating the plaintiff, even though policy allowed for lesser discipline).

Similarly, courts have similarly found that failure to follow proper procedure with regard to narcotics custody or tracking is a legitimate, nondiscriminatory reason for an adverse employment action. *See, e.g.*, *Singleton v. Select Specialty Hosp.-Lexington, Inc.*, 391 F. App'x 395, 399–400 (6th Cir. 2010) (finding that "problems with narcotics control and documentation" were a legitimate, nondiscriminatory reason for termination).

Thus, the Court finds that Defendants have carried its burden of demonstrating a legitimate, nondiscriminatory reason for terminating Plaintiff.

### iii. Whether Defendants' Reason Was Pretext For Discrimination

A plaintiff may rebut a defendant's showing of legitimate nondiscriminatory reason by showing that this reason was mere pretext, designed to mask retaliation. *Singleton*, 391 F. App'x at 400. "To demonstrate pretext at the summary judgment stage, the plaintiff must show by a preponderance of the evidence either (1) that the employer's proffered reasons for the adverse employment action had no basis in fact, (2) that the proffered reasons were not the true reason, or (3) that they were

insufficient to motivate discharge." *Rhoades v. Standard Parking Corp.*, 559 F. App'x 500, 502 (6th Cir. 2014). Plaintiff relies on the second and third reasons, as there is no dispute that Defendants' proffered reasons were factually false.

The Sixth Circuit has described rebuttal under the second manner of proving pretext as when:

> [T]he plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by, Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason," an employee cannot establish pretext simply because the reason is ultimately shown to be incorrect. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). An employer has an honest belief in its rationale when it "reasonably relied 'on the particularized facts that were before it at the time the decision was made.' " *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). "An employer's reason for discharge does not have to be a good reason . . . to escape liability," so long as it is "based on grounds not proscribed by the statute." *Hoffman*, 394 F.3d at 422.

To establish the insufficiency of Defendants' proffered reasons under the third manner of proving pretext, Plaintiff must show by a preponderance of the evidence that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [Plaintiff]." *Rhoades*, 559 F. App'x at 505 (quoting *Manzer*, 29 F.3d at 1084).

On December 17, 2014, when Defendants terminated Plaintiff, they had evidence that Plaintiff tested positive on a December 10, 2014 drug test for benzodiazepines, for which he did not have a prescription, and evidence of thirty discrepancies on his narcotics documentation paperwork in less than a two-month period. It is undisputed that the end of Plaintiff's FMLA leave came up repeatedly as a specific marking point when coworkers noticed a change in his behavior on the job, and thus when Defendants began to audit his records. The weight of evidence that Defendants considered Plaintiff's FMLA leave does not make it more likely than not that Defendants' stated reason was a pretextual cover-up for discrimination, rather than one based on an honest belief of Plaintiff's failure to comply with narcotics wasting policies and his positive drug test.

Although the Drug-Free Workplace Policy provides that "[e]mployees who test positive may be referred to the Employee Assistance Program (EAP)," it does not mandate that employees be referred in lieu of termination. Dkt. No. 32-26, p. 5

(Pg. ID 457). Despite extensive discovery, Plaintiff has not uncovered a single other employee in a patient care role who was referred to EAP in lieu of termination after a positive drug test or discrepancies in a narcotics charting audit. He has offered evidence that an individual in a non-patient care role—an animal cage washer—was referred to EAP in lieu of termination for alcohol use, but has failed to show this individual was "similar in 'all of the *relevant* aspects.' " *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

When the evidence offered is viewed in the light most favorable to Plaintiff, a reasonable jury could not find that Defendants treated Plaintiff any differently than similarly situated comparators. The evidence shows that individuals who worked in patient care roles and were suspected of drug diversion or substance abuse were audited, like Plaintiff. That neither of the similarly situated female CRNAs were terminated is not a result of differential treatment by Defendants. Rather, it is a result of these women choosing to resign voluntarily in lieu of drug testing and termination. Defendants did not provide either of the those CRNAs with better treatment than that afforded to Plaintiff. *See Johnson v. Fifth Third Bank*, No. 16-1111, 2017 WL 1244879, at *8 (6th Cir. Apr. 5, 2017) (concluding that evidence that a male employee was given the opportunity to resign prior to

termination, without more, did not establish pretext for gender discrimination against female employee).

Absent additional evidence that the adverse employment action was based on impermissible discrimination, such as differential treatment of similarly situated individuals who did not take FMLA leave, a reasonable jury could not infer that Defendants discriminated against Plaintiff based on his FMLA leave. *See Turner*, 854 F.3d at 929. The Court grants Defendants summary judgment on Count II.

### 2. Plaintiff's State Law Claims

In Counts III–V, Plaintiff alleges that Defendants discriminated against him based on disability, sex, and age in violation of the Michigan Persons with Disabilities Civil Rights Act and the Elliott-Larsen Civil Rights Act. Dkt. No. 4, pp. 11–14 (Pg. ID 27–30). Although the Court may, pursuant to 28 U.S.C. § 1367, exercise supplemental jurisdiction over the state law claims ancillary to the relief sought, for the reasons set forth below, the Court declines to exercise supplemental jurisdiction over Counts III–V and will dismiss these claims.

Under the standard enunciated in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), and codified in 28 U.S.C. § 1367(c), this Court has broad discretion to exercise its supplemental jurisdiction. Even where the district court "arguably ha[s] supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), the [district] court has discretion to decline to exercise its supplemental

jurisdiction where the state law claims predominate or where it has dismissed plaintiff's federal claims." *Cirasuola v. Westrin*, 124 F.3d 196, *1 (6th Cir. 1997).

Section 1367(c) provides that district courts may decline to exercise supplemental jurisdiction over related state claims if:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The United States Supreme Court has stated that:

Our decisions have established that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right, and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons . . . Accordingly, we have indicated that district courts should deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine.

*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997) (internal citations and quotations omitted).

In this instance, the Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims because the Court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Accordingly, the Court will dismiss Plaintiff's Counts III–V without prejudice.

## V. CONCLUSION

For the reasons stated herein, the Court will **GRANT IN PART and DENY IN PART** Defendants' Motion for Summary Judgment [32]. The Court grants summary judgment as to Counts I and II and denies summary judgment as to Counts III and IV. The Court **DISMISSES** Counts I–II with prejudice and Counts III–V without prejudice to renewal in state court.

SO ORDERED.

Dated: August 24, 2017

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 24, 2017, by electronic and/or ordinary mail.
/s/ Tanya Bankston
Deputy Clerk